## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**STEVE HAYES, JR.**

**VERSUS**

**TIMOTHY HOOPER, WARDEN**

**CIVIL ACTION**

**NO.  23-406**

**SECTION "T"(4)**

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**.  Upon review of the entire record,[1] the Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2) (2006).[2]

## I.   Factual Background

The petitioner, Steve Hayes, Jr. ("Hayes"), is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.  On December 19, 2005, Hayes was charged in St. James Parish with second degree murder of Shanikra Striggs in violation of La. Rev. Stat. § 14:30.1.[3]  Hayes entered a plea of not guilty in the case.[4]

---

[1]The State Court Record was electronically filed by the State at Rec. Doc. 11 in parts Nos. 11-1 through 11-6.

[2]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the 14:64.3claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[3]Rec. Doc. 11-1, at 20, Bill of Information, 12/19/05.

[4]Rec. Doc. 11-1, at 4, Minute Entry, 1/5/06.

The record reflects[5] that on November 7, 2005, the victim, Shanikra Striggs, also known as "Neeky," died as a result of a single gunshot wound to the head at 11:00 p.m. Five hours later, Hayes, known as "Beware," gave a statement to the police. He admitted that he was present when the gun fired but claimed that the shooting was unintentional and accidental. Hayes revealed the location of the gun. The bullet removed from Striggs matched the gun and the casing that police found at the scene.

Joyce Harris, the victim's mother explained that Hayes was the victim's boyfriend for about a year before the shooting, but Striggs had recently broken off the relationship. Hayes lived with Striggs, Striggs' young son, Harris, and Harris's husband in Harris's mobile home. Hayes, however, was supposed to move out by the end of November. On the evening of the shooting, after Striggs came home from work, she and Hayes went to walk around the park. Harris recalled that, upon their return from their walk, Striggs took the cordless house phone in the bathroom with her while she took a bath. Hayes asked to use the telephone, and Striggs allowed him to use it momentarily. Harris testified that upon Striggs completing her bath, Striggs approached Hayes, spoke to him, and then told Harris that she was going to her car. Harris was under the impression that Striggs wanted to have a private telephone conversation. Harris recalled that she observed Hayes briefly walk out to the porch and reenter the home. According to Harris, Hayes did not appear upset at the time. Harris recalled that she saw Hayes go outside again. She did not see him carrying a gun. Moments later, she heard Striggs yell, "Beware." Harris heard a gunshot. She ran to the door and saw Hayes flee the scene. Harris found Striggs slumped in the driver's seat of her vehicle with her legs outside the vehicle.

---

[5]The facts were taken from the opinion of the Louisiana Fifth Circuit Court of Appeal on direct appeal. *State v. Hayes,* 70 So. 3d 27, 30-35 (La. App. 5th Cir. 2011); Rec. Doc. 11-4, at 219-29, 5th Cir. Opinion, 10-KA-685, 5/24/11.

Harris testified that Hayes was a jealous person and envious of Striggs's relationships with other people.  Harris explained that Hayes checked Striggs's cell phone and accompanied her when she went out.  She, however, admitted that she did not see Striggs and Hayes arguing that evening.

According to Harris, months earlier, on August 21, 2005, her husband was hospitalized. Because she was concerned about a possible break in while she and her husband were away from the home, she asked Hayes to place her husband's gun, which was in a drawer in their bedroom, in a safe place.  She recalled that the gun and the clip were separated, and the gun was not loaded. Hayes told her that he placed the gun in the closet.  Harris testified that she never suggested to Hayes that it would be safer to keep the gun in the car rather than in the residence, and that Hayes never told her that he was going to put the gun in the car.

Michael Williams, also known as "Black," Michael Benberry, and Niafreece Jamaal Bey, lived out of town with his fiancée at the time of the shooting.  He and Striggs were friends who regularly spoke on the telephone.  Williams was incarcerated at the time of Hayes's trial.  Williams testified that he spoke to Striggs several times on the telephone the night of the shooting. Telephone records verified those calls.  Striggs first called Williams around 7:00 p.m., and they spoke for about an hour.  Striggs called for a second time approximately twenty minutes later, and they spoke for approximately another hour.  Two minutes later, she called him a third time. Williams testified that he heard Hayes say, "Get off the f- - - phone.  You on the phone with him again?"  Williams told Striggs to speak to Hayes, and that Williams would speak with Striggs the next day and ended the call.  However, Strigg's called him back minutes later and told Williams that Hayes did not want to talk about anything.  This call was a four minute call at 9:58 p.m., six or seven minutes before the police were dispatched.  During that last call, Striggs told Williams that she would continue the conversation in her car.  Williams heard Striggs walk outside and the

3

car door open and close, making a familiar dinging sound.  Approximately three minutes after he first heard the sound, he heard the dinging sound again indicating that the vehicle door opened once more.  He did not hear tapping on the window.  Williams heard Striggs scream, "No, Beware, no, no, no, no, no."  The phone then went dead.  Williams called a friend and asked him to go to Striggs's home to check on her welfare.  The friend later informed him that Striggs was dead.

Deputy Dustin Jenkins assisted in the homicide investigation.  He began searching for Hayes at 10:30 p.m. on November 7, 2005.  At 3:00 a.m. on November 8, 2005, he was driving in a patrol car with Sergeant Hamilton when he saw a subject walking through the fog.  He and Hamilton exited the vehicle and drew their weapons.  They advised Hayes to get on the ground and he complied.  They handcuffed Hayes and read him his *Miranda* rights.  They removed Hayes to a neutral location for safety purposes.  Upon questioning by Hamilton, Hayes advised that the weapon was under a shed approximately four yards from the crime scene, and that he had hid under the shed throughout the night.

Detective Juliet Zeringue with the St. James Parish Sheriff's Office was the lead case agent. When she responded to the crime scene, she found the deceased victim with a bullet wound to her head.  The victim's legs were sticking out of the vehicle, and her head was propped up against the side of the car door.  The victim did not have any other signs of trauma, and there were no defensive wounds on her hands.  The keys were in the car ignition when she arrived at the scene.  She located a .380 casing about four feet from the driver's door.

Zeringue testified that Harris advised her that Hayes was the only person outside with Striggs when she heard the gunshot and that she witnessed him flee the scene.  The search for Hayes began almost immediately.  According to Zeringue, Hayes was taken into custody after 3:00 a.m.  The gun was located under a shed.  One bullet was in the chamber and one bullet was in the

magazine.  Hayes's slippers were found at the scene.  Zeringue opined that the slippers were found in a position that suggested that Hayes had run away.

Zeringue conducted gun residue tests on each of Hayes's hands.  His right hand tested positive for gun residue.  Detective Zeringue explained that the gun had a slide.  She explained that if someone grabbed the barrel of the gun one of two things would occur: (1) the gun would not fire because the person would be able to hold the slide on the gun; or (2) if the casing ejected, it would cut the inside of the hand due to the force of the chamber opening and closing.  The victim, however, did not have a cut on the inside of her hand.  She did have a broken fingernail, but it was undetermined when the fingernail had been broken.

Hayes gave a taped statement to Zeringue.  Hayes claimed that he and Striggs did not argue that evening.  He claimed that he removed the gun from the room he shared with the victim with the intention of putting it in the car because kids had been playing in the house a day earlier.  He claimed that the safety lock on the gun did not work well and that the clip was always slipping.  Hayes claimed that he knocked on the window of the car because it was locked, and that the victim opened the door.  According to Hayes, he pulled the gun out to tell the victim to put it in the glove box, at which time the victim "freaked out" and "banged" him causing the gun to discharge.  Later in his statement, Hayes claimed that the victim grabbed the barrel of the gun  Hayes claimed that he fled because he was scared.  He, however, denied, running.  Rather, he claimed he walked up the street.

Because the victim was right-handed, Zeringue tested that hand, which yielded negative results.  Zerinque admitted that it was a mistake on her part that she did not have another instant shooter kit to test the victim's left hand.  Therefore, she could not determine how close the victim's left hand was to the gun when it went off.

Zerinque interviewed Williams.  Williams told her that he could hear Striggs and Hayes arguing while he was on the phone with Striggs.  He claimed that Hayes asked her to hang up the phone and repeatedly entered the room where she was talking.  Williams told Zerinque that he heard Striggs go outside and heard the dinging of her car when she got in.  He claimed that the car door was not locked.  He recalled that less than five minutes after she called him for the final time, he heard Striggs yell at Hayes to stop.  Williams told Zerinque that he did not hear anyone knock on the car door or window.

Zerinque also interviewed Harris who told her that months earlier, due to an impending hurricane and for safety purposes, she asked Hayes to remove the gun and place it in the victim's bedroom.  Harris told Zerinque that she observed Hayes walk outside twice before the shooting and that he did not appear to be upset.  She did not observe him carrying a gun.  When Zerinque asked her whether Hayes and Striggs had raised their voices or argued, Harris responded, "No, not really."

Zerinque's investigation revealed that Hayes had a reputation for being a jealous person and constantly thought that the victim was cheating on him.  She also learned that Hayes became jealous whenever Striggs spoke with another male.

Dr. Randall Poche, the St. James Parish Coroner, evaluated the victim at the crime scene and sent her body for an autopsy.  He completed the death certificate.  The cause of death was cerebral injury, secondary gunshot wound to the head.

Dr. James C. Traylor, the expert in forensic pathology who was present during the autopsy of the victim, testified that the cause of death was a single gunshot wound to the head.  He explained that the presence of soot deposit allowed him to classify the injury as a close contact gunshot wound.  Dr. Traylor opined that the gun was one inch or closer to the wound.  Dr. Traylor

testified that the victim did not have soot or blood on her hand, which he would have expected to see had the victim grabbed the gun as it discharged.  Nor were there any abrasions or other injuries to her hands.  He conceded that soot could be present but undetected by him.  He also conceded that the gun was close enough to her body that Striggs could have touched it with her hand.  When asked by defense counsel whether it was possible that the shooting was an accident, Dr. Traylor stated, "What the hell is a muzzle end of the weapon doing next to somebody's head that's an accident?"  Dr. Traylor testified that based on his experience with over 3,000 autopsies, with the vast majority being gunshot wounds, he had never seen an accidental shooting to the head in the manner claimed by the defense.  Dr. Traylor, however, stated that although he did not think it was possible, he was not testifying that it was not possible that an accident occurred.

Brian Larvadain lived on the same street as Harris and Striggs and knew "Beware" for about seventeen or eighteen years.  Approximately two weeks before the shooting, Hayes told Larvadain that he and the victim had been fighting and that he "got a mind to kill his old lady." Larvadain testified that he told Hayes that, "you know you clowning," and Hayes began to laugh. Larvadain recalled that he gave a statement to Detective Zeringue, and that he told her that he was concerned when Hayes made his statement.  He, however, claimed that Hayes confirmed that he was just joking.

Jim Churchman, an expert in forensic science, examined the firearm, cartridge case, and a bullet.  He fired the gun three times in the laboratory.  He found that the safety lock on the gun functioned properly.  He found the weapon to be functional, although the magazine lock was a missing spring that could cause the magazine to slip out.  He explained that the presence of the magazine has no bearing on the firing mechanism once there is an unfired cartridge in the barrel. Churchman explained that this type of weapon does not accidentally discharge unless dropped on

a hard surface.  He opined that the impact of the gun being brushed or banged while it was in someone's hand was not the type of force that he would expect to cause an accidental discharge. He explained that in order for a semi-automatic single-action weapon like this one to fire, the trigger pull required pressure in the range of five to seven pounds.

Churchman stated that an injury, such as a hole or abrasion, would occur from contact with the slide, if at the time the gun was fired when a person had a hand wrapped around the barrel.  He explained that an injury would occur when the violent pull on the slide snagged the hand as the cartridge case ejected.  He also explained that a burn would occur as a result of the muzzle blast.

Jasmine Thomas, an expert in forensic DNA analysis, examined DNA profiles from swabs taken from the handle, trigger and barrel of the gun, the door handle, and samples from Striggs, and Hayes.  Thomas was unable to get any DNA on the trigger.  The DNA profiles on the barrel and the handle of the gun were consistent with the DNA profile obtained from Hayes.  There was no DNA on the gun, including the barrel, from the victim.  Thomas explained that she would have expected to see the victim's DNA if it were present.  Thomas explained that the absence of the victim's DNA could possibly be explained by two factors: (1) the gun was handled by different people and the machine might pick up only the more dominant person; or (2) the victim might not have left enough DNA there.

Sergeant Joseph Hamilton testified that he searched for Hayes after the shooting.  At 3:06 a.m., he saw Hayes walking through the fog lifting his shirt up and down.  He handcuffed Hayes, read him his *Miranda* rights, and took him to another area for safety purposes.  Hayes advised that he had been hiding under the shed and that that was where he had left the gun.  Hayes was taken to the Sheriff's Department and booked.

Lieutenant Andrew Duhe was the first officer to respond to the scene. When he arrived at the scene, he saw a pair of shoes in the street and positioned his vehicle over the shoes so that they would not be disturbed. Duhe located a shell casing on the ground next to the driver's door. After Hayes was apprehended, Duhe located the gun underneath a shed. The ground had been disturbed, and it appeared that someone had crawled underneath the shed.

Hayes testified in his defense. He testified that in August 2005, Harris called him and asked him to remove the gun from her room because her son had recently gotten out of jail and she did not want him to steal it. Hayes removed the gun and placed in the top of closet of the room he shared with Striggs. He claimed that when he removed it from the drawer in Harris's room, the gun and the clip were together. He claimed that the Sunday before Halloween, he cautioned Striggs because she was "digging in the top of the closet for something." As a result, he moved the gun from the top of closet and placed it in a bag in the closet. He denied telling Larvadain that he had a mind to kill his girlfriend.

Hayes testified that, on the evening of the shooting, there was no animosity between himself and Striggs. He admitted that he asked to use the telephone when Striggs was in the bathroom, but he denied knowing that she was actually using the phone, being upset, asking who was on the phone with her, and asking Striggs to get off the phone. He claimed he returned the phone to Striggs after he used it. Hayes testified that he did not know Williams. Hayes claimed that Williams lied when he testified that he heard Hayes tell the Striggs to get off the phone.

Hayes initially testified that on the night of the shooting, he moved the gun from the closet because Striggs's son and another child had been playing in the closet that weekend. He, however, also testified that the victim told him to put the gun in a storage unit. He admitted that he placed the gun in his waistband under his shirt and walked past Harris. He denied hiding the gun,

however. Rather, he claimed he merely wanted to keep the gun out of the sight of a child in the household. He testified that he went outside to place a gun in the car's glove compartment out of concern for the safety of children, and with the intent of bringing the gun to the storage unit the following day.

Hayes claimed that he went to the driver's side of the vehicle as he had just showered and was wearing slippers and because there was oil on the ground on the passenger's side of the vehicle. He claimed that he expected the car door to be unlocked because he left it that way after they returned from the park. Hayes testified that he did not know that Striggs was in the car until he found it locked. Hayes claimed that he initially could not see Striggs because it was dark outside and the car had tinted windows. According to Hayes, Striggs opened the door after he knocked, and he told her that he did not know she was outside. Hayes testified that Striggs started to get out of the car and panicked when she saw the gun. He denied that Striggs screamed and called out his nickname. He claimed that Williams lied when he testified that he heard Striggs say, "Beware, no, no, no."

Hayes testified that Striggs swung her hand which caused his arm to hit the inside of the door frame and caused the gun to fire. He also claimed that the victim grabbed the front part of the barrel of the gun. He testified that he stated that because of the degree of force Striggs exerted, his arm hit the inside of the doorframe, injuring his right wrist. Hayes testified that his wrist was swollen when he arrived at the police station, and that Deputy Percy Louque gave him Ziploc ice packs for a swollen wrist.

Hayes testified that both the gun's safety did not work well and that clip was always slipping out. In his statement to police, he recounted that he thought there were two or three bullets

in the gun although the gun was never fully loaded.  At trial, he claimed that that he did not know whether there was a bullet in the chamber because he never checked the gun.

Although Hayes admitted that he panicked and left the scene, he testified that he immediately walked quickly to get help from an aunt who lived nearby.  He claimed that he could not run due to an injury, but claimed he took his slippers off so he could walk faster.  He testified that the aunt did not respond to his knocking.  He claimed that he put the gun under the shed, but that he could not return to the scene because he saw that some of the family had arrived and he did not believe that they give him an opportunity to explain what had happened.  He claimed that he hid under a shed after he heard someone in the area threaten to kill him.  Hayes testified that his actions evidenced no intent to kill Striggs and run away because he did not bring money, identification, or a phone with him when he went outside.

Deputy Percy Louque testified that he was not working when Hayes was initially arrested.  He testified that, after Hayes was in the St. James Parish Jail a couple of days, Hayes complained that his hand hurt.  Louque recalled that he gave Hayes ice to put on his hand.

On rebuttal, Detective Zeringue testified that the intake form completed when Hayes was booked indicated no signs of trauma or obvious pain.  She explained that the arrestees are asked questions including "are you hurt or injured" and that the box on Hayes's form corresponding to that question was not highlighted.  Detective Zeringue interviewed Hayes about eight hours before he was booked.  She testified that he did not appear to be in any type of physical distress, and he did not complain about his hand or arm.  She testified that had Hayes had any type of injury or asked for ice, she would have noted that and immediately informed the jailer.  Zerinque recalled that she examined Hayes's wrist and the back of his hand while performing the gunshot residue test on his hands and saw no signs of injury.

Sergeant Joseph Hamilton also testified in rebuttal. He testified that Hayes did not tell him that his hand, wrist or arm was hurting nor did he ask for ice.

On December 6 through 8, 2006, Hayes was tried by a jury, and was found guilty as charged.[6] On February 6, 2007, the Trial Court sentenced Hayes to life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence.[7]

On direct appeal, Hayes's appellate counsel filed a brief raising the following claims: (1) the Trial Court should have granted a mistrial when other crimes evidence was introduced; and (2) insufficient evidence.[8]

On May 24, 2011, the Louisiana Fifth Circuit affirmed Hayes's conviction and sentence finding that the evidence was sufficient to support the jury's verdict.[9] The court also found the evidence of Hayes's prior arrests was properly admitted and that a mistrial was not warranted.[10] Finally, the court found that even if evidence of Hayes's arrest for other crimes was improperly admitted, the error was harmless.[11]

On February 3, 2012, the Louisiana Supreme Court denied Hayes's related writ application.[12] Hayes's conviction became final on May 3, 2012 when the time for filing a petition

---

[6]Rec. Doc. 11-1, at 13-15, Trial Minutes, 12/6/06; *id.* at16-17, Trial Minutes,12/7/06; *id.* at 18, Trial Minutes, 12/8/06; *id.* at 72, Verdict of the Jury, 12/8/06; *id.* at 234-253, Trial Transcript, 12/6-8/06; Rec. Doc. 11-2, at 1-250, Trial Transcript (con't), 12/6-8/06; Rec. Doc. 11-3, at 1-250, Trial Transcript (con't), 12/6-8/06; Rec. Doc. 11-4 at 1-218, Trial Transcript (con't), 12/6-8/06.

[7]Rec. Doc. 11-1, at 19, Sentencing Minutes, 2/6/07; *id.* at 76, Reasons for Sentence, 2/6/07.

[8]Rec. Doc. 11-5, at 122-48, Appellate Brief, 10/KA/0685, 9/2/10.

[9]*State v Hayes*, 70 So. 3d 27, 35-36 (La. App. 5th Cir. 2011); Rec. Doc. 11-5, at 171-73, 5th Cir. Opinion, 10-KA-685, 5/24/11.

[10]*Id.* at 36-40; Rec. Doc. 11-5, at 173-80, 5th Cir. Opinion, 10-KA-685, 5/24/11.

[11]*Id.* at 40; Rec. Doc. 11-5, at 180-81, 5th Cir. Opinion, 10-KA-685, 5/24/11.

[12]*State v. Hayes*, 79 So. 3d 1024 (La. 2012); Rec. Doc. 11-6, at 69, La. S. Ct. Order, 2011-KO-1370, 2/3/12;

for writ of certiorari with the United States Supreme Court expired.  *See Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (time for filing for certiorari with the United States Supreme Court is included in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup. Ct. Rule 13(1).

On March 4, 2013, Hayes filed a pro se application for post-conviction relief asserting the following claims for relief: (1) the Trial Court abused its discretion by denying the defense's reverse *Batson* challenge thereby denying him the right to an impartial jury and a fair trial; (2) ineffective assistance of appellate counsel; (3) ineffective assistance of trial counsel in failing to call an expert witness; (4) the cumulative effect of the errors rendered his trial fundamentally unfair.[13]

The State filed procedural objections and an answer.[14]  Hayes filed a traverse.[15]  On May 9, 2013, the Trial Court denied the application.[16]  It does not appear that Hayes filed a writ application with either the Louisiana Fifth Circuit or the Louisiana Supreme Court seeking review of the decision.

On November 22, 2021, Hayes filed a second application for post-conviction relief, pursuant to La. Code Crim. P. art 926.2,[17] claiming newly discovered evidence that an automatic

---

Rec. Doc. 11-5, at 187-211, Pro Se La. S. Ct. Writ Application, 2011-KO-1370, 6/28/11.

[13]Rec. Doc. 11-4, at 250, Application for Post-Conviction Relief, 3/4/13; Rec. Doc. 11-5, at 1-49, Application for Post-Conviction Relief (con't), 3/4/13 .

[14]Rec. Doc. 11-5, at 50-51, Procedural Objections and Answer of the State of Louisiana in Response to the Defendant's Application for Post Conviction Relief, 3/3/13.

[15]Rec. Doc. 11-5, at 52-55, Traverse to District Attorney's Procedural Objections to Petition for Post Conviction Relief, 4/24/13.

[16]Rec. Doc. 11-5, at 58, Order, 5/9/13.

[17]La. Code Crim P. art. 926.2, effective on August 1, 2021, provides for a freestanding claim of factual innocence not based on DNA evidence.

firearm can easily discharge accidentally without the safety being on and can fire without a finger on the trigger proves his actual innocence, and asserting that a firearms expert was necessary to conduct an examination of the firearm.[18]  On March 21, 2022, the Trial Court denied and dismissed Hayes's application.[19]  The Trial Court found that, even if there was additional evidence of an accidental discharge, there was sufficient evidence that a rational juror still could have found Hayes guilty of the offense of conviction or of a felony offense that was a responsive verdict to the offense of conviction.[20]

On May 27, 2022, the Louisiana Fifth Circuit denied Hayes's related writ application.[21] The court found that Hayes failed to meet the initial requirements of La. Code Crim. P. art. 926.2(B)[22] as he failed to submit any exhibits or other information regarding a source supporting

---

[18]Rec. Doc. 11-5, at 64-77, Second or Subsequent Uniform Application for Post-Conviction Relief, 11/22/21.

[19]Rec. Doc. 11-5, at 88, Judgment, 3/21/22; *id.* at 89-91, Reasons for Judgment, 3/21/22.

[20]Rec. Doc. 11-5, at 90-91, Reasons for Judgment, 3/21/22.

[21]Rec. Doc. 11-6, at 174-76, 5th Cir. Order, 22-KH-216, 5/27/22; 5th Cir. Writ Application, 22-KH-216, 5/9/22.

[22]La. Code Crim P. art. 926.2(B) provides as follows:

> B. (1)(a) To assert a claim of factual innocence under this Article, a petitioner shall present new, reliable, and noncumulative evidence that would be legally admissible at trial and that was not known or discoverable at or prior to trial and that is either:
>
> (i) Scientific, forensic, or nontestimonial documentary evidence.
>
> (ii) Testimonial evidence that is corroborated by evidence of the type described in Item (i) of this Subparagraph.
>
> (b) To prove entitlement to relief under this Article, the petitioner shall present evidence that satisfies all of the criteria in Subsubparagraph (a) of this Subparagraph and that, when viewed in light of all of the relevant evidence, including the evidence that was admitted at trial and any evidence that may be introduced by the state in any response that it files or at any evidentiary hearing, proves by clear and convincing evidence that, had the new evidence been presented at trial, no rational juror would have found the petitioner guilty beyond a reasonable doubt of either the offense of conviction or of any felony offense that was a responsive verdict to the offense of conviction at the time of the conviction.

his allegation that an automatic firearm like the one used in the offense could easily discharge accidentally without the safety engaged and without a finger on the trigger, and that his mere statement did not constitute scientific, forensic, physical or nontestimonial documentary evidence.[23]   The court further found that Hayes failed to show that the information was not discoverable prior to trial particularly considering Hayes's testimony and arguments at trial that the gun accidentally discharged.[24]   Finally, the court noted that the jury heard evidence from an expert, Churchman, regarding the circumstances under which the gun could accidentally fire.[25] The court concluded that Hayes "failed to present 'new, reliable, and noncumulative evidence that would be legally admissible at trial and that was know known or discoverable at or prior to trial' as required by La.C.Cr.P. art 926.2(B)."[26]

On November 8, 2022, the Louisiana Supreme Court denied Hayes's related writ application, finding that he failed to show any lower court error.[27]

## II.    Federal Habeas Petition

On February 1, 2023, Hayes filed his original petition for federal habeas corpus.[28]   Hayes claims factual innocence.  He further claims that the state courts erred in denying his request for relief.

---

[23] *Id.* at 175.

[24] *Id.* at 175-76.

[25] *Id.* at 176.

[26] *Id.*

[27] *In re; Steve Hayes, Jr.*, 349 So. 3d 561 (La. 2022); Rec. Doc. 11-6, at 231, La. S. Ct. Order, 2022-KH-01017, 11/8/22; *id.* at 180-230, La. S. Ct. Writ Application, 22 KH 1017, 6/22/22.

[28] Rec. Docs. 3 and 3-1.

The State filed a response claiming that Hayes's petition is untimely.[29]  In the alternative, the State argues that Hayes fails to present any new scientific evidence of the weapon's proclivity to discharge accidentally.  It concludes that the state court's finding that Hayes failed to present clear and convincing new evidence such that no rational juror would have found him guilty beyond a reasonable doubt of the crime charged or of any felony offense that is a responsive verdict is not contrary to or a reasonable application of constitutional law as established by the Supreme Court.

## III.    General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[30] applies to this petition, which was filed in this Court under the mailbox rule on February 1, 2023.[31]  The threshold questions on habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and the claims must not be in "procedural default."  *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

---

[29]Rec. Doc. 9.

[30]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[31]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se.  Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995).  Hayes signed his pleadings on February 1, 2023, which the earliest date Hayes could have given his petition to prison officials for mailing.

The State asserts and the record shows that Hayes's federal petition was not timely filed under the AEDPA.  For the following reasons, Hayes's petition should be dismissed as time-barred.

## IV.    <u>Statute of Limitations</u>

The AEDPA codified in 28 U.S.C. § 2244(d)(1)(A) requires a petitioner to bring his § 2254 claim within one year of the date the state court conviction became final or one year.[32]  *Duncan v. Walker*, 533 U.S. 167, 176-80 (2001).  In addition to the one-year period that runs from finality, Section 2244 recognizes that a new one-year period may run from the date on which the factual predicate of a claim could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1)(D).  The statute also provides two other triggering events that do not apply here.  For purposes of § 2244(d)(1)(B), Hayes does not assert that he was subject to state action that impeded

---

[32] The statute of limitations provision of the AEDPA provides as follows:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of-

A. the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

B. the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State actions;

C. the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

D. the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

him from filing his federal petition in a timely manner.  Further, Hayes's claims are not based on a constitutional right that has been newly recognized by the Supreme Court and made retroactive to cases on collateral review to involve for purposes of § 2244(d)(1)(C).

The State argues that Subsection A applies in this case.  Pursuant to § 2244(d)(1)(A), the court must consider whether Hayes filed his federal petition within one year of the finality of his conviction.  As state above, Hayes's conviction was final under federal law on May 3, 2012, when his time to file a timely petition for writ with the Supreme Court expired.  Pursuant to § 2244, Hayes had one year from that date, or until May 3, 2013, to timely file a federal petition for habeas corpus relief, which he did not do.  Thus, literal application of the statute would bar Hayes's petition as of that date unless he is entitled to tolling as provided for under the AEDPA.

### A.     <u>Statutory Tolling under Subsection A</u>

Section 2244(d)(2) provides that the time during which a properly filed application for state post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation.  *See* 28 U.S.C. § 2244(d)(2).  In order for a state post-conviction application to be considered "properly filed" within the meaning of § 2244(d)(2), the applicant must have complied with all of the State's procedural requirements, such as timeliness and place of filing.  *Pace v. DiGuglielmo*, 544 U.S. 408, 413-14 (2005); *Williams v. Cain*, 217 F.3d 303, 306-08 & n.4 (5th Cir. 2000) (quoting *Smith v. Ward*, 209 F.3d 383, 384-85 (5th Cir. 2000)); *Villegas v. Johnson*, 184 F.3d 467, 468-69 (5th Cir. 1999), *reh'g denied*, 196 F.3d 1259 (5th Cir. 1999).  For purposes of the AEDPA, a timeliness calculation in Louisiana requires the application of the prison mailbox rule to state court pleadings.  *Causey v.*

*Cain*, 450 F.3d 601, 604-05 (5th Cir. 2006).  The Court has applied this rule in presenting the procedural history recited above with the exception of when Hayes was represented by counsel.

A matter is "pending" for § 2244(d)(2) purposes "as long as the ordinary state collateral review process is 'in continuance.' "  *Carey v. Saffold*, 536 U.S. 214, 219-20 (2002); *Williams*, 217 F.3d at 310 (quoting *Bennett v. Artuz*, 199 F.3d 116, 120 (2d Cir. 1999)) (finding that a matter is "pending" for Section 2244(d)(2) purposes until further appellate review is unavailable under Louisiana's procedures); *see also Melancon v. Kaylo*, 259 F.3d 401, 405 (5th Cir. 2001).

The phrase "other collateral review" in the statute refers to state court proceedings challenging the pertinent judgment subsequently challenged in the federal habeas petition. *Dillworth v. Johnson*, 215 F.3d 497, 501 (5th Cir. 2000) (finding that a state habeas petition challenging a prior conviction in one county was other collateral review even though filed as a challenge to a second conviction in a different county); *Nara v. Frank*, 264 F.3d 310, 316 (3d Cir. 2001), *overruled on other grounds by Carey*, 536 U.S. at 214 (finding that a motion to withdraw a guilty plea is "other collateral review").  A "pertinent judgment or claim" requires that the state filings for which tolling is sought must have challenged the same conviction being challenged in the federal habeas corpus petition and must have addressed the same substantive claims now being raised in the federal habeas corpus petition.  *Godfrey v. Dretke*, 396 F.3d 681, 687-88 (5th Cir. 2005).

In Hayes's case, the AEDPA filing period began to run on May 4, 2012, the day after his conviction was final under federal law, and continued to run for three hundred and four days until

March 4, 2013, when Hayes submitted his first application for post conviction relief.[33]  The one-year limitations period remained tolled during the pendency of that proceeding through June 10, 2013, thirty days after the Trial Court denied his application for post-conviction relief.[34]  *See Grillette v. Warden, Winn Correctional Center*, 372 F.3d 765, 769-71 (5th Cir. 2004) (a state application ceases to be pending when the time for supervisory review expires).  The AEDPA one-year limitations period began to run again on June 11, 2013, when Hayes did not seek review of the denial of his application for post-conviction relief by the Trial Court and continued to do so until August 12, 2013 when it expired.[35]  Hayes had no other collateral review pending in any court during that period.  Hayes did not file his federal petition under the mailbox rule until February 1, 2023.

Hayes claims that because of the newly enacted version of La. Code Crim. P. arts. 926.2 and 926.3, a "new clock" began running after the Louisiana Supreme Court denied his writ application related to his second or successive application for post conviction relief filed on November 22, 2021.[36]  He appears to contend that as his second application for post-conviction relief was filed in a timely fashion under state law, his federal habeas is timely.  He, however,

---

[33] Rec. Doc. 11-4, at 250, Application for Post Conviction Relief with Memorandum of Law in Support and Request for Evidentiary Hearing, 3/4/13; Rec. Doc. 11-5, at 1-24, Uniform Application for Post-Conviction Relief and Memorandum of Law, 3/4/13.  While the State argues that Hayes filed his application on March 5, 2013, Rec. Doc. 9-1, at 5, 9, Hayes's certificate of service is dated March 4, 2013.  Rec. Doc. 11-5, at 24, Uniform Application for Post-Conviction Relief and Memorandum of Law, 3/4/13.

[34] The period ended on Saturday, June 8, 2013, which caused the final day to fall to the next business day, Monday, June 10, 2013.  *See* La. Code Crim. P. art. 13 ("The last day of the period is to be included, unless it is a legal holiday, in which event the period runs until the end of the next day which is not a legal holiday"); Fed. R. Civ. P. 6(a)(1)(C) ("... if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.").

[35] The sixty-first day was Sunday, August 11, 2013, which caused the final day to fall to the next business day, Monday, August 12, 2013.  Fed. R. Civ. P. 6(a)(1)(C).

[36] Rec. Doc. 3, at 14.

provides no legal support for his contention that, due to a change in state law, that the AEDPA limitation period was reinitiated.

Because Hayes's second or successive application was filed well after the time for filing a federal petition under § 2244(d)(1) had lapsed, that state habeas application does not toll the one-year limitations period. *See Madden v. Thaler*, 521 F. App'x 316, 320 (5th Cir. 2013) (citing *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000)); *Magee v. Cain*, Civ. Action No. 99–3867, 2000 WL 1023423, at *4 (E.D. La. July 24, 2000), *aff'd*, 253 F.3d 702 (5th Cir. 2001) (citing *Williams v. Cain*, Civ. Action No. 00–536, 2000 WL 863132, at *2 (E.D. La. June 27, 2000)).  Simply put, once the federal limitations period expired, "[t]here was nothing to toll."  *Butler*, 533 F.3d at 318.

Therefore, Hayes's federal petition, filed under the mailbox rule on February 1, 2023, was filed more than nine years after the AEDPA filing period expired on August 12, 2013.  His untimely federal petition should be dismissed with prejudice unless he meets another exception or excuse to the running of the AEDPA limitations period.

### B.    Statutory Tolling under Subsection D

Under § 2244(d)(1)(D), the AEDPA limitations period commences upon the discovery of the factual predicate of the claim when the factual predicate could not have been discovered earlier through the exercise of due diligence.  This subsection does not delay the commencement of the limitations period until the date on which the factual predicate of a claim was in fact discovered or developed; rather, it delays it only until the date on which it "could have been discovered through the exercise of due diligence."  28 U.S.C. § 2244(d)(1)(D); *see Manning*, 688 F.3d at 189-90 (argument that § 2244(d)(1)(D) runs from actual discovery of claim is an "untenable theory."); *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000) ("... the time commences when the factual

predicate 'could have been discovered through the exercise of due diligence,' not when it was actually discovered by a given prisoner ... [and] not when the prisoner recognizes their legal significance."). The United States Fifth Circuit has held "that this means the date a petitioner is on notice of the facts which would support a claim, not the date on which the petitioner has in his possession evidence to support his claim." *In re Young*, 789 F.3d 518, 528 (5th Cir. 2015) (citing *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998) ); *see also Hunter v. Cain*, 478 F. App'x 852 (5th Cir. 2012) (citing *Starns v. Andrews*, 524 F.3d 612, 620-21 & n. 5 (5th Cir. 2008) (holding that the relevant date under § 2244(d)(1)(D) is the date that the habeas petitioner or his criminal attorney received the information in question) ).

Although Hayes does not specifically invoke § 2244(d)(1)(A), the commencement date under this subsection would not have begun in November 2021 when he filed his second application for post-conviction relief. Rather, this provision would run from the date on which he could have discovered the factual basis for his claim through the exercise of due diligence.

The purported factual predicate of Hayes's claim of actual innocence is that he learned of evidence that a weapon such as the one used in the murder could accidentally fire in the manner he claimed. However, Hayes has always maintained that the weapon accidentally fired and that was his defense at trial. At that time, he presented no evidence, other than his own testimony, supporting his claim that the gun accidentally fired. As explained later in this report, while he claims he recently learned of new evidence supporting his claim of accidental discharge, he fails to present any actual new evidence.

Further, Hayes claims actual innocence and that the state courts violated La. Code Crim. P. art. 926.2 in denying his request for relief. Neither of those claims is cognizable on federal habeas review for the following reasons.

To the extent that Hayes argues that the state courts' denial of relief violated Louisiana law, particularly, La. Code Crim. P. art. 926.2, it simply is not cognizable in this federal habeas corpus proceeding.  Federal habeas review simply does not lie for errors of state law.  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011); *see Estelle v. McGuire*, 502 U.S. 62, 67-68, (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *see also Hogue v. Johnson*, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review).  A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law."  *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted).

Insofar as stating a federal claim, the United States Supreme Court has yet to recognize a freestanding claim of actual innocence as an independently cognizable ground for relief in federal habeas corpus proceedings.  *Burton v. Stephens*, 543 F. App'x 451, 458 (5th Cir. 2013); *Brown v. Vannoy*, 800 F. App'x 277, 278 (5th Cir. 2020) (per curiam) (citing *Kinsel v. Cain*, 647 F.3d 265, 270 n. 20 (5th Cir. 2011)).  "Claims of actual innocence based on newly-discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence").  For this reason, courts in this Circuit routinely reject freestanding actual-innocence claims to support federal habeas relief.  *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009) ("The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review."); *Keil v. McCain*, Civ. Action 18-9410, 2019 WL 2439424, at *30 (E.D. La. May 21,

2019), *report & recommendation adopted*, 2019 WL 2437177 (E.D. La. June 11, 2019); *Brown v. Vannoy*, Civ. Action 19-9121, 2019 WL 2396793, at *1-2 (E.D. La. May 20, 2019), *report & recommendation adopted*, 2019 WL 2395533 (E.D. La. June 6, 2019), *aff'd*, 800 F. App'x 277 (5th Cir. 2020).  Thus, Hayes fails to state a cognizable claim in this Section 2254 habeas proceeding based on his freestanding assertion of actual innocence.

That presents Hayes with two obstacles, both of which are fatal.  First, § 2244(d)(1)(D) simply is not even triggered by inclusion of a non-cognizable claim.  *See, e.g.*, *Ramey v. Akpore*, No. 12 C 7174, 2014 WL 201843, at *3 (N.D. Ill. Jan. 17, 2014) ("[I]it is inconceivable that the court would allow a habeas petitioner to save untimely claims from dismissal under § 2244 by the artifice of adding an obviously non-cognizable, though timely, ineffective assistance of post-conviction counsel claim to his petition."); *Ware v. Secretary, Department of Corrections*, No. 8:11-cv-418, 2011 WL 5525359, at *6 (M.D. Fla. Nov. 14, 2011) ("Since a free-standing claim of actual innocence is not a cognizable claim, [a prisoner] is not entitled to employ such a claim to reset his time clock under § 2244(d)(1)(D).").  Second, even if that were not the case and his claims could be considered timely, they would still fail on the merits because, again, they simply are not cognizable under § 2254.

For all of the foregoing reasons, statutory tolling under 28 U.S.C. § 2244(d)(2) is unavailable.  Accordingly, Hayes's federal petition was not timely filed and must be dismissed with prejudice for that reason.

### C.   No Equitable Tolling

The post-AEDPA jurisprudence also provides for equitable tolling of the AEDPA limitations period where rare or extraordinary circumstances may have prevented a diligent

petitioner from timely pursuing federal habeas corpus.  *Pace*, 544 U.S. at 419; *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999); *Cantu-Tzin v. Johnson*, 162 F.3d 295, 299 (5th Cir. 1998); *Davis v. Johnson*, 158 F.3d 806, 810-11 (5th Cir. 1998), *cert. denied*, 526 U.S. 1074 (1999). However, equitable tolling is warranted only in situations where the petitioner was actively misled or is prevented in some extraordinary circumstance outside of his control from asserting his rights. *Pace*, 544 U.S. at 418-19; *see Cousin v. Lensing*, 310 F.3d 843, 848 (5th Cir. 2002); *see Holland v. Florida*, 560 U.S. 631, 652-53 (2010) (finding that equitable tolling was warranted where attorney was more than negligent when he failed to satisfy professional standards of care by ignoring the client's requests to timely file a federal petition and in failing to communicate with the client over a period of years in spite of the client's letters); *Hardy v. Quarterman*, 577 F.3d 596, 599-600 (5th Cir. 2009) (finding that equitable tolling was warranted where petitioner suffered a significant state-created delay when, for nearly one year, the state appeals court failed in its duty under Texas law to inform him that his state habeas petition had been denied, petitioner diligently pursued federal habeas relief, and he persistently inquired to the court.); *United States v. Wynn*, 292 F.3d 226, 230 (5th Cir. 2002) (finding that tolling was warranted when defendant was deceived by attorney into believing that a timely motion to vacate was filed); *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999) (quotation omitted) ("A garden variety claim of excusable neglect does not support equitable tolling."); *Fisher*, 174 F.3d at 715 (finding that tolling is not justified during petitioner's seventeen-day stay in psychiatric ward, during which he was confined, medicated, separated from his glasses and thus rendered legally blind, and denied meaningful access to the courts); *Cantu-Tzin*, 162 F.3d at 300 (finding that State's alleged failure to appoint competent habeas counsel did not justify tolling); *Davis*, 158 F.3d at 808 n.2 (assuming

without deciding that equitable tolling was warranted when federal district court three times extended the deadline to file habeas corpus petition beyond expiration of AEDPA grace period). A habeas petitioner bears the burden of proof to establish entitlement to equitable tolling. *Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir. 2002).

Hayes does not argue that equitable tolling applies in this case.  Furthermore, the record shows an inexplicable lack of diligence on his part in filing for federal habeas corpus relief and no extraordinary circumstances that would warrant equitable tolling.  It is well-settled that mistake, ignorance of the law, and a prisoner's pro se status and lack of legal training do not constitute rare and exceptional circumstances warranting equitable tolling.  *Johnson v. Quarterman*, 483 F.3d 278, 286 (5th Cir. 2007); *Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002); *Fierro v. Cockrell*, 294 F.3d 674, 682 (5th Cir. 2002); *Felder v. Johnson*, 204 F.3d 168, 171 (5th Cir. 2000); *see also Tate v. Parker*, 439 F. App'x 375 (5th Cir. 2011) ("The alleged extraordinary circumstances endured by Tate, such as ignorance of the law, lack of knowledge of filing deadlines, a claim of actual innocence, temporary denial of access to research materials or the law library, and inadequacies in the prison law library, are not sufficient to warrant equitable tolling"); *Mathis v. Thaler*, 616 F.3d 461, 474 (5th Cir. 2010) ([E]quitable tolling "is not intended for those who sleep on their rights").  Accordingly, the Court finds that Hayes is not entitled to equitable tolling.

### D.    No Other Excuse or Exception to Time Bar

The Supreme Court has held that "actual innocence, if proved, serves as a gateway through which a petitioner may pass" notwithstanding the "expiration of the statute of limitations" under the AEDPA.  *McQuiggin*, 569 U.S. at 386.  "This rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal

constitutional errors do not result in the incarceration of innocent persons."  *Id.* at 392, (quoting

*Herrera v. Collins*, 506 U.S. 390, 404 (1993)).

The Supreme Court, however, has cautioned that "[t]he miscarriage of justice exception,

we underscore, applies to a severely confined category: cases in which new evidence shows 'it is

more likely than not that no reasonable juror would have convicted [the petitioner].' "  *Id.* at 394-

95 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).  The Supreme Court has made clear that

"habeas corpus petitions that advance a substantial claim of actual innocence are extremely rare."

*Schlup*, 513 U.S. at 321.

> The United States Fifth Circuit Court of Appeals has explained:
>
> This exception's demanding standard requires evidence of innocence so strong that
> a court cannot have confidence in the outcome of the trial unless the court is also
> satisfied that the trial was free of nonharmless constitutional error.  The standard is
> seldom met.
>
> An actual-innocence claim is only established when it is shown that, in the light of
> newly discovered evidence, it is more likely than not that no reasonable juror would
> have found petitioner guilty beyond a reasonable doubt.  Therefore, a credible claim
> must be supported by new reliable evidence – whether it be exculpatory scientific
> evidence, trustworthy eyewitness accounts, or critical physical evidence – that was
> not presented at trial.  Actual innocence is then demonstrated only when the court
> scrutinizes the likely impact on reasonable jurors of the overall, newly
> supplemented record to conclude that, in the light of all evidence – both the
> evidence presented at trial and that newly discovered – no juror, acting reasonably,
> would have voted to find petitioner guilty beyond a reasonable doubt.

*Floyd v. Vannoy*, 894 F.3d 143, 154-55 (5th Cir. 2018) (citations, quotation marks, and brackets

omitted).

While Hayes does not specifically invoke *McQuiggin*, he claims in his habeas petition is

that he is actually innocence.  He, however, does not he make the required showing.  As the United

States Supreme Court has explained: "To be credible, such a claim requires petitioner to support

his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.  Because such evidence is unavailable in the vast majority of cases, claims of actual innocence are rarely successful," *Schlup*, 513 U.S. at 324, and thus rejected "in virtually every case." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (citation omitted).

As explained by the Louisiana Fifth Circuit,[37] Hayes has presented no new evidence whatsoever of actual innocence.  He simply offers the same unsupported claim of innocence that was presented as part of his defense at trial, i.e., that the gun accidentally discharged, a claim already considered by the jury at his trial and by the state courts when examining his claim of insufficient evidence on direct appeal.  While he offers no new evidence of accidental discharge, at trial, the firearms expert, Jim Churchman, testified that he tested the weapon three times.[38]  He testified that, while the weapon could accidentally discharge if dropped on a hard surface from as little as three to five feet, tests did not demonstrate that such a weapon could malfunction and misfire when bumped or banged in the manner claimed by Hayes.[39]

While Hayes claims that he recently learned of new information about how a firearm such as the one used in the offense could accidentally discharge, again, he submits *no actual evidence* in support of this allegation.  He does not submit any sources, documentary or otherwise, to support his claim that the weapon could have accidentally discharged under the circumstances claimed. Nor does he submit any evidence that the actual weapon used in the crime, or a similar weapon, has been recently tested and that such testing supports his claim of accidental discharge.

---

[37]Rec. Doc. 11-6, at 174-76, La. 5th Cir. Order, 22-KH-216, 5/27/22.

[38]Rec. Doc. 11-3, at 147-50, 156, Trial Transcript (con't), 12/6-8/06.

[39]*Id.* at 151, 156-58.

Accordingly, he has not met "the threshold requirement" for *McQuiggin* to apply. *McQuiggin*, 569 U.S. at 386.

Further, even if there were evidence that the weapon could accidentally discharge in the manner claimed by Hayes, the Louisiana Fifth Circuit found that Hayes had not shown that such evidence was not available before trial.[40] That is fatal, because evidence that was available to "[a petitioner] or trial counsel at or before trial" does not qualify as "new." *See Hancock v. Davis*, 906 F.3d 387, 390 (5th Cir. 2018); *accord Tyler v. Davis*, 768 F. App'x 264, 265 (5th Cir. 2019); *Uptergrove v. Director, TDCJ-CID*, Civ. Action No. 4:18cv586, 2021 WL 3288296, at *2 (E.D. Tex. July 30, 2021) ("In order for evidence to constitute new evidence that can support a claim of actual innocence and allow a petitioner to overcome the limitations period, it must have been unknown to counsel and *not discoverable with reasonable investigation.*" (emphasis added)); *see also Shank v. Vannoy*, No. 16-30994, 2017 WL 6029846, at *2 (5th Cir. Oct. 26, 2017) (Higginson, J., on denial of a certificate of appealability) ("Evidence that was available to be presented to the jury at the time of trial is not now 'new' evidence, even if it was not actually presented to the jury.").

Regardless, even accepting as true that there is new evidence that the weapon could have accidentally fired in the manner Hayes's claims, that is not enough: "The meaning of actual innocence ... does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Schlup*, 513 U.S. at 329; *accord Bosely v. Cain*, 409 F.3d 657, 665 (5th Cir. 2005) ("At best, [petitioner]'s new evidence shows that a reasonable doubt could have been found to exist; it fails, however, to

---

[40] Rec. Doc. 11-6, at 175-76, 5th Cir. Order, 22-KH-216, 5/27/22.

satisfy his burden of showing that no reasonable juror would have found him guilty."); *Crayton v. Cain*, Civil Action No. 02-2162, 2013 WL 5305673, at *5 (E.D. La. Sept. 19, 2013) ("[A] petitioner does not make a colorable 'actual innocence' claim simply by showing that, in light of his new evidence, his guilt is questionable or that reasonable doubt is conceivable." (quotation marks omitted)).  Hayes simply has not shown that *no juror* would find him guilty had new evidence that the weapon could accidentally discharge in the manner he claimed been presented.

For all of these reasons, Hayes has failed to establish that he qualifies as "actually innocent" under *McQuiggin*.  As a result, the "actual innocence" exception does not aid him.

Hayes's federal petition deemed filed on February 1, 2023, was not timely filed within the one-year AEDPA statute of limitations period which expired on August 12, 2013.  There is no statutory tolling, equitable tolling, or other exception applicable to or that would excuse his untimely filing.  Hayes's petition was not timely filed and should be dismissed for that reason.

## V.    <u>Recommendation</u>

For the foregoing reasons, it is **RECOMMENDED** that Steve Hayes, Jr.'s petition for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE** as time-barred.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir.

1996).[41]

New Orleans, Louisiana, this 30th   day of June, 2023.

_____
                    **KAREN WELLS ROBY**
         **UNITED STATES MAGISTRATE JUDGE**

---

[41]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.